UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
Case No. 5:17-CV-218

| | |
|---|---|
| **DELINDA GAYE BOWLES** | |
| **Plaintiff** | |
| v. | **COMPLAINT** |
| **SHELLPOINT PARTNERS, LLC., and EQUIFAX INFORMATION SERVICES, INC.** | **WITH DEMAND FOR TRIAL BY JURY** |
| **Defendant** | |

**NOW COMES** Plaintiff Delinda Gaye Bowles, by and through Counsel, and pursuant to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681 et seq., The Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, et seq., North Carolina General Statutes § 75-50, et seq., ("NCDCA"), and North Carolina tort law, respectfully pleads to this Court the following:

## JURISDICTION AND VENUE

1. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

2. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2).

## PARTIES

3. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

4. Delinda Gaye Bowles ("Plaintiff") is an individual and citizen of the State of North Carolina who currently resides in Iredell County, North Carolina.

5. At all times relevant to this action the Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681(c).

6. At all times relevant to this action Plaintiff was a "consumer" as defined by N.C. Gen. Stat. § 75-50(1).

7. Defendant, Shellpoint Partners, LLC ("Shellpoint"), is a "furnisher" of consumer credit information as defined in 15 U.S.C. § 1681s-2.

8. At all times relevant to this action Shellpoint was a "person" as that term defined in 15 U.S.C. § 1681a(b).

9. Shellpoint is a business entity which regularly conducts business nationally, and has its corporate office at 140 E. 45th Street, 37th Floor, New York, NY 10017.

10. Shellpoint can be reached for service through its correspondence address at Shellpoint Mortgage Servicing, PO Box 10826, Greenville, SC 29603-0826.

11. At all times relevant to this action Shellpoint was engaged in commerce in North Carolina.

12. At all times relevant to this action Shellpoint was a "debt collector" as defined by N.C. Gen. Stat. § 75-50(3).

13. The alleged debt at issue arose out of a transaction that was primarily for personal, family or household purposes.

14. At all times relevant to this action the alleged debt in this matter was a "debt" alleged to be owed as defined by N.C. Gen. Stat. §75-50(2).

15. Equifax Information Services, LLC ("Equifax"), is a Georgia limited liability company doing business throughout the country and in the state of North Carolina.

16. Equifax is a "consumer reporting agency" (CRA) as defined in 15 U.S.C. § 1681a(f).

17. Equifax can be reached for service through its Registered Agent, Corporation Service Company, at 2626 Glenwood Avenue, Suite 550, Raleigh, North Carolina 27608.

18. At all times relevant to this action Equifax was engaged in commerce in North Carolina by engaging in, *inter alia*, reporting of consumer credit information.

19. At all times relevant to this action Equifax was a "person" as that term defined in 15 U.S.C. § 1681a(b).

## FACTUAL ALLEGATIONS

20. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein

21. In 2007, Plaintiff applied for a second mortgage with American General Finance, Inc., (AGF) on her property 8107 Summit Ridge Drive, Catawba, North Carolina.

22. The Plaintiff was granted that credit extension.

23. In 2011 AGF changed its name to Springleaf Financial Services (Springleaf).

24. On June 6, 2012, Springleaf entered into a settlement agreement with the Plaintiff to resolve a mortgage issue.

25. During this time the Plaintiff was being represented by attorney L. Ragan Dudley with Homesley, Gaines, Dudley & Clodfelter, LLP.

26. The settlement agreement reduced the then-current balance of $44,665.97 to $22,332.99.

27. Plaintiff made her monthly payments of $620.36 as arranged in the settlement agreement.

28. In early 2013, Resurgent Capital Services, L.P. (Resurgent) became successor to Springleaf.

29. Sometime prior to October 1, 2013, Shellpoint Partners, LLC, (or a subsidiary thereof) acquired Resurgent.

30. Plaintiff never received a notice from either Springleaf or Resurgent that the servicer of her loan was changing.

3

31. In July 2013, Plaintiff learned Springleaf had become Resurgent when she called to see why her June 2013 payment had not been auto-drafted.

32. On July 12, 2013, Plaintiff emailed Resurgent as a follow-up to a conversation with a customer service agent.

33. In the email the Plaintiff explained to Resurgent that her payment had not been auto-drafted for June 2013 because Springleaf sold her mortgage to Resurgent and she had not received information on how or where to make payments.

34. Plaintiff had to send the settlement agreement that she made with Springleaf to Resurgent since it had no knowledge of the reduced amount because Springleaf failed to notice Resurgent of the reduced amount.

35. On February 14, 2014, Plaintiff received a "Notice of Transfer of Servicing" letter from Resurgent stating that her loan was sold to Shellpoint, effective March 1, 2014.

36. Resurgent listed 940 Southwest Drive, Davidson, North Carolina, as the property that secured the loan she was paying.

37. The Plaintiff never had a mortgage on the 940 Southwest Drive, Davidson, North Carolina address ("940") with the Defendant.

38. 940 is a property that the Plaintiff rented but has never owned.

39. The Plaintiff never had any loan that was secured by 940.

40. Once again the Plaintiff had to send her settlement agreement to Shellpoint because Resurgent did not forward the agreement.

41. Meanwhile, Shellpoint sent Plaintiff monthly statements for the second mortgage and continued to list the property address for the loan security as the 940 address.

4

42. On October 15, 2015, Plaintiff sent a final payment of $3,078.28 to pay off account number ending in 5758 (the second mortgage), which was still serviced by Shellpoint.

43. The payment slip attached to Shellpoint's billing statement still listed 940 as the property which secured the Plaintiff's second mortgage.

44. The Plaintiff attempted to correct this error multiple times to no avail.

45. Plaintiff made multiple calls to Shellpoint requesting a final payoff letter but she never received one.

46. Enclosed with the final payment on October 15, 2015, was the payment slip with the mortgage security address still listed incorrectly.

47. The Plaintiff marked out the incorrect address and wrote in the correct property address as she had done on all previous statements from Shellpoint.

48. November 2015, Shellpoint sent the Plaintiff a billing statement which said the Plaintiff still owed money on the second mortgage account, though the loan was paid in full.

49. The statements for February 2017 and March 2017 told the Plaintiff that she owed $755.36 to Shellpoint.

50. These billing statements were confusing because they did not say why the Plaintiff owed any money.

51. Shellpoint continued billing the Plaintiff until March 2017.

52. Plaintiff sent an inquiry to Shellpoint regarding an investigation into the payoff of the mortgage loan.

53. On March 1, 2016, Shellpoint responded to Plaintiff's inquiry by letter stating "As of the date on this letter, Shellpoint considers this loan to be closed and settled in full with no refunds remaining due or owed."

54. On or about the beginning of March 2016, Plaintiff tried to obtain a loan through Waterstone Mortgage for an investment property in Florida.

55. Waterstone Mortgage denied the loan.

56. The Plaintiff was told by Mary Coates, a loan officer with Waterstone Mortgage, that she was denied credit due to the incorrect information Shellpoint reported to Equifax.

57. Plaintiff had been trying to clean up her credit report prior to applying for the loan and after this denial she redoubled her efforts.

58. Ms. Coates recommended that Plaintiff contact Home Loan Assist to help resolve the incorrect information Shellpoint was reporting.

59. March 10, 2016, Plaintiff entered into a contract Home Loan Assist.

60. The Plaintiff paid Home Loan Assist $99.00 per month for one year for their assistance, as well as a $29.00 consulting fee.

61. Home Loan Assist was unable to get Shellpoint to correct the negative, incorrect information it published on its tradeline on the Plaintiff's credit report.

62. The Plaintiff terminated her contract with Home Loan Assist after its failed attempted to correct the negative Shellpoint tradeline.

63. On October 6, 2016, the Plaintiff filed a dispute with Equifax (Confirmation # 6280000275) to correct this error.

64. On October 24, 2016, Equifax changed the tradeline to show that the debt was paid in full.

65. Thereafter, Shellpoint began making collection calls on the alleged debt even though the Plaintiff owed nothing.

66. Shellpoint's collection calls occurred on at least the following dates when the Shellpoint agent left voicemails on both the Plaintiff's landline and cell phone: March 10, 2016,

6

November 15, 2016, November 17 2016, December 10, 2016, December 20, 2016, January 3, 2017, January 10 2017, January 17, 2017, January 28, 2017, January 31, 2017, February 10, 2017, and twice on February 17, 2017.

67. In late November 2016, Plaintiff tried once again to obtain a loan through Waterstone Mortgage.

68. The Plaintiff was denied this loan as well.

69. Plaintiff disputed her credit sixteen times with Equifax from the dates March 23, 2016, to January 1, 2017.

70. In May 2017, Plaintiff tried to obtain a loan with Blue Sky Mortgage.

71. Plaintiff was approved with a high interest rate of 8.5% instead of 5% to 6%.

72. Plaintiff was told she was only qualified for a high interest rate due to the incorrect information Shellpoint reported to Equifax.

73. The acts of the Defendant were intentional, willful, reckless, negligent and unlawful.

74. These acts were done with malice and reckless disregard for the effect they would have on the Plaintiff.

75. The acts of the Defendants have caused economic, emotional, psychological and physical damages to the Plaintiff for which she should be compensated.

## **VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**

76. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

77. Plaintiff continually disputed the alleged debt with the Defendants, who would admit the error and correct the trade lines only to continue to unlawfully report the alleged debt as the Plaintiff's account.

7

78. Plaintiff suffered and still suffers damages to reputation, credit score, and has had multiple instances where she was denied credit due to inaccurate trade lines appearing on her credit reports. Examples of such credit denials are:

a) Plaintiff was denied on her first attempt to raise her credit limit on Home Depot credit card;

b) Plaintiff was denied a loan from Waterstone Mortgage in March 2016;

c) Plaintiff was denied a loan from Waterstone Mortgage again in November 2016;

d) Plaintiff has a much higher interest rate of 8.5% on her mortgage with Blue Sky Mortgage than she should have to pay.

79. Furnishers of credit information have a duty under the FCRA to investigate disputes from consumers as to the accuracy of information reported about them. To wit:

> After receiving notice pursuant to section 611(a)(2) [§ 1681i] of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall:
>
> (A) conduct an investigation with respect to the disputed information;
> (B) review all relevant information provided by the consumer reporting agency pursuant to section 611(a)(2) [§ 1681i];
> (C) report the results of the investigation to the consumer reporting agency;
> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
> (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly –
>  (i) modify that item of information;
>  (ii) delete that item of information; or
>  (iii) permanently block the reporting of that item of information.

See 15 U.S.C. § 1681s-2(b)(1).

80. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

81. 15 U.S.C. § 1681n imposes civil liability on any CRA or furnisher "who willfully fails to comply with any requirement" of the Act. See 15 U.S.C. § 1681n(a).

82. 15 U.S.C. § 1681o provides for civil liability against any CRA or furnisher which is negligent in failing to comply with any requirement imposed under the Act.

**SHELLPOINT'S FAILURE TO CONDUCT REASONABLE REINVESTIGATIONS**

83. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

84. Shellpoint was properly noticed by the Plaintiff that she had paid the reduced settlement agreement amount in full.

85. Shellpoint has in its possession records from the Plaintiff that show that the second mortgage had been reduced by Springleaf, who formerly owned her mortgage.

86. Shellpoint knows the Plaintiff does not owe the debt it is continuing to report.

87. Plaintiff contacted Equifax repeatedly to dispute the accuracy of the information being reported about her.

88. Upon information and belief, pursuant to 15 U.S.C. § 1681i(a)(2), Shellpoint received notification of this dispute from Equifax.

89. Shellpoint has repeatedly failed to conduct a reasonable investigation into the accuracy of information related to the disputed trade lines, in violation of 15 U.S.C. § 1681s-2(b)(1).

90. Notwithstanding Shellpoint's actual knowledge that Plaintiff paid off alleged debts Shellpoint's failure to conduct a reasonable investigation of the accuracy of its reporting of

9

this adverse information shows an intentional and reckless disregard for Plaintiff's rights under the FCRA.

91. In addition to the violation as described above, Shelllpoint failed to satisfy its duty under 15 U.S.C. § 1681s-2(b) of updating incomplete or inaccurate information it had previously reported to CRAs upon receipt of each notice from Equifax that Plaintiff disputed the accuracy of the previously reported information.

92. Shellpoint's failure to report that Plaintiff disputed the accuracy of the trade line was a failure to accurately update the information because it was "misleading in such a way and to such an extent that it [could] be expected to have an adverse effect" on Plaintiff. *Gorman v. Wolpoff & Abramson, LLP, et al.*, 584 F.3d 1147 (9th Cir. 2009); *See also Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142 (4th Cir. 2008).

93. As a direct and proximate result of Shellpoint's willful and/or negligent refusal to comply with the FCRA as outlined above, Plaintiff has suffered substantial loss and damage including, but not limited to: economic loss including $1,217 paid to Home Loan Assist to help her with the improperly reported credit line, a greatly increased interest rate on a mortgage, loss of opportunity to obtain credit, damage to reputation, expenditure of considerable time and out-of-pocket expenses, worry, fear, distress, frustration and embarrassment, entitling her to an award of actual damages in amounts to be proved at trial, plus attorneys' fees together with the costs of this action pursuant to 15 U.S.C. § 1681o.

94. Shellpoint's indifference as to its obligations under the FCRA reveals a conscious disregard of the rights of Plaintiff, and the injuries suffered by Plaintiff are attended by circumstances of fraud, malice, and reckless, willful and wanton misconduct, calling for an assessment of punitive damages against Shellpoint, pursuant to 15 U.S.C. § 1681n(a)(2).

## EQUIFAX'S FAILURE TO ADOPT AND/OR FOLLOW REASONABLE PROCEDURES

95. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

96. Despite actual and implied knowledge that Plaintiff's debts to Shellpoint were paid off, Equifax readily sold false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

97. On each such instance, Equifax willfully and/or negligently failed to follow reasonable procedures to assure maximum possible accuracy of the consumer reports it prepared and/or published pertaining to Plaintiff, in violation of 15 U.S.C. §1681e(b).

98. Through Plaintiff's communications with Equifax, Equifax knew, or has sufficient reason to know, that when it prepared and sold a consumer report about Plaintiff, the information it is circulated was extremely inaccurate and damaging to Plaintiff.

99. Equifax has corrected and republished the same incorrect information multiple times.

100. Nevertheless, Equifax has taken no measures to stop painting a false and damaging picture about Plaintiff.

101. Plaintiff was unable to obtain certain financing because of the grossly inaccurate credit file maintained by Equifax.

102. Plaintiff has suffered out-of-pocket loss as a result of Equifax's willful and/or negligent violations of the FCRA.

103. Plaintiff has not been free to take advantage of various credit opportunities available to other consumers because of Equifax's failure to report only accurate information about her.

104. As a direct and proximate result of Equifax's willful and/or negligent refusal to follow reasonable procedures to assure "maximum possible accuracy" as specifically mandated by

the FCRA, Plaintiff has suffered loss and damage including, but not limited to: economic loss including but not limited to $1,217 paid Home Loan Assist to help her with the improperly reported credit line, a greatly increased interest rate on a mortgage, denial of financing, loss of opportunity to obtain credit, damage to reputation, expenditure of considerable time and out-of-pocket expenses, worry, fear, distress, frustration and embarrassment, entitling her to an award of actual damages in amounts to be proved at trial, plus attorneys' fees together with the costs of this action pursuant to 15 U.S.C. § 1681o.

105. Upon information and belief, Equifax has been sued on multiple occasions over recent years for falsely reporting an individual as owing debt that was not owed by the consumer despite being on notice that such debt was not owed.

106. Upon information and belief, Equifax has exhibited a pattern of refusing to follow reasonable procedures as mandated by the FCRA, ultimately valuing its own bottom line above its "grave responsibility" to report accurate data on consumers.

107. Equifax's pattern of refusal to follow reasonable procedures as mandated by the FCRA reveals a conscious disregard of the rights of Plaintiff.

108. The injuries suffered by Plaintiff are attended by circumstances of fraud, malice, and reckless, willful and wanton misconduct, entitling Plaintiff to statutory damages, punitive damages, attorneys' fees and costs pursuant to 15 U.S.C. § 1681n(a)(2)

109. The FCRA mandates that a CRA conduct an investigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposes a 30-day time limitation for the completion of such an investigation. *Id*.

110. The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is, in fact, inaccurate, or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

111. On multiple occasions Plaintiff initiated disputes with Equifax requesting that it correct and/or delete specific items on her credit file that were patently inaccurate, misleading and highly damaging to her, namely, references to her owing an outstanding balance to Shellpoint.

112. Plaintiff specifically advised Equifax on numerous occasions that a mistake had been made, provided all necessary information to Equifax to support same, and requested the trade lines be corrected accordingly.

113. Either Equifax conducted no investigation of Plaintiff's disputes, or such "investigations" were so deficient as to allow objectively false and highly damaging information to remain in Plaintiff's credit file.

114. By failing to conduct a reasonable reinvestigation into Plaintiff's disputes in this regard, Equifax willfully and/or negligently violated 15 U.S.C. § 1681i(a)(1) with respect to each dispute lodged by Plaintiff.

115. As a direct and proximate result of Equifax's repeated disregard for each of Plaintiff's disputes, Plaintiff has suffered a significant loss of trust in the credit reporting system and its accountability to the average consumer.

116. Equifax's pattern of refusal to correct patently false information as mandated by the FCRA reveals a conscious disregard of the rights of Plaintiff. The injuries suffered by Plaintiff are attended by circumstances of fraud, malice, and/or willful and wanton

misconduct, calling for statutory damages, an assessment of punitive damages against Defendant, plus attorneys' fees and costs pursuant to 15 U.S.C. § 1681n.

## VIOLATIONS OF THE NORTH CAROLINA DEBT COLLECTORS ACT
## N.C. GEN. STAT § 75-50, *et seq*.

### Against Shellpoint Partners, LLC., only.

117. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

118. Defendant repeatedly violated several provisions of the North Carolina Debt Collector's Act (NCDCA). Defendant's violations include, but are not limited to, violations of each respective statute as evidenced by the conduct described herein. The Defendant Shellpoint's behavior constitutes:

a) Specific violations of N.C. Gen. Stat. § 75-51(8) which proscribes "[t]hreatening to take any action not permitted by law. (1977, c. 747, s. 4.)."

b) General violations of N.C. Gen. Stat. § 75-52, a statute which states that "[n]o debt collector shall use any conduct, the natural consequence of which is to oppress, harass, or abuse any person in connection with the attempt to collect any debt."

c) Specific violations of N.C. Gen. Stat. § 75-52(3) which proscribes "[c]ausing a telephone to ring or engaging any person in telephone conversation with such frequency as to be unreasonable or to constitute a harassment to the person under the circumstances[.]"

d) General violations of N. C. Gen. Stat. § 75-54, a statute which states that "[n]o debt collector shall collect or attempt to collect a debt or obtain information concerning a consumer by any fraudulent, deceptive or misleading representation."

e) Specific violations of N. C. Gen. Stat. § 75-54(4) which proscribes "[f]alsely representing the character, extent, or amount of a debt against a consumer or of its status in any legal proceeding."

f) General violations of N.C. Gen. Stat. § 75-55 which states that "[n]o debt collector shall collect or attempt to collect any debt by use of any unconscionable means."

119. The result of the Defendant's actions is that the Plaintiff suffered emotional anxiety about having to pay a debt she did not owe, the worry over having to pay the same debt twice, the concern about the expenses she had to incur to stop the debt collection, the fear and anxiety which to a physical toll on the Plaintiff and the aggravation of having to deal with a harassing debt collector when she did not owe the money the collector was trying to get from her.

## DEMAND FOR JURY TRIAL

120. Plaintiff exercises her right to a trial by jury on all issues so triable.

**WHEREFORE,** the Plaintiff respectfully requests the following relief from the Court:

1. Compensatory damages against the Defendant in an amount to be determined at trial that will fairly and reasonably compensate her for the emotional distress, aggravation, annoyance, humiliation, and financial hardship suffered as a result of the Defendant's unlawful acts;

2. Punitive damages against the Defendant in an amount to be determined at trial for the willful, wanton and/or reckless disregard for her legal rights;

3. Actual damages in amounts to be proved at trial, plus attorneys' fees together with the costs of this action pursuant to 15 U.S.C. § 1681o;

4. Statutory damages, an assessment of punitive damages against Defendant, plus attorneys' fees and costs pursuant to 15 U.S.C. § 1681n;

5. Actual damages to be determined at trial and statutory damages of $4,000 per violation as allowed pursuant to N. C. Gen. Stat. §75-50, et seq.;

6. Costs and reasonable attorney's fees pursuant to N.C. Gen. Stat. §§ 75-16.1 and 75-50, *et seq.*; and

7. For such further and relief that this Court may deem just, equitable and proper.

**TODAY** is December 5, 2017.

**COLLUM & PERRY**

By: */s/ M. Shane Perry*
M. Shane Perry
NC Bar Number: 35498
109 W. Statesville Ave.,
Mooresville, NC 28115
Telephone: 704-663-4187
Facsimile: 704-663-4178
shane@collumperry.com
*Attorney for Plaintiff*